32639. CLARK *v.* FITZGERALD MILLS CORPORATION *et al.*

32640. PEACOCK *v.* FITZGERALD MILLS CORPORATION *et al.*

DECIDED OCTOBER 7, 1949. REHEARING DENIED NOVEMBER 1, 1949.

*Morris B. Abram, Heyman, Howell & Heyman, E. C. Collins, Hugh Howell Jr., Robert C. Young,* for plaintiffs.

*McDonald & McDonald,* for defendants.

FELTON, J. Mrs. James Henry Clark filed a claim for compensation against Fitzgerald Mills Corporation and its insurance carrier for the death of her husband on May 22, 1945. The claim was denied by the single director and the full board, and on appeal to the superior court the award denying compensation was affirmed. The exception here is to the last judgment.

On the hearing before the director it was agreed that James Henry Clark was an employee of the employer on May 22, 1945, and that he was killed at that time by pistol shots fired by Willis Barnes. It was stipulated that because of the management there was considerable friction between some of the employees and the management of the mill, the stipulation being made subject to an objection by the employer and insurance

carrier that the fact was not relevant and was necessarily hearsay. It was stipulated that Willis Barnes had not worked for the employer since May 9, 1945, but that he had not been discharged, and that the homicide took place in Ben Hill County on the premises of the employer. By agreement the record of the case of The State *v.* Willis Barnes in which Barnes was tried for murder in the Superior Court of Ben Hill County, Ga., was received in evidence. R. Tom Smith testified in the murder trial, in substance: that he was standing in front of the mill office talking to J. H. Clark, when Willis Barnes walked up and shot Clark four times with a pistol; that neither said anything to the other and that Clark had nothing in his hand; that Barnes went on into the office and that he heard a shot from the office. W. L. Gaines testified in the murder trial in substance as follows: that he saw Willis Barnes shoot J. H. Clark while he was standing with R. Tom Smith; that he didn't hear any words and couldn't tell whether Clark had a gun in his hand; that after Barnes shot Mr. Clark he went up the office steps and that he heard one further shot; that after he heard that one further shot he saw Barnes going out across the railroad; that he had a gun at that time and when he was crossing the railroad he looked like he was reloading it; that it looked like he "unbritched" it; that he went in the spinning room and then came back out of the door; that then Joe Brown Peacock came by and he heard a shot fired; that what he was relating was a continuous act and took place approximately at the same time; that he shot Peacock something like four times and then turned and went toward his house; that Peacock had nothing in his hand.

Garbutt Mayes testified in the murder trial substantially as follows: that he heard the shots at Clark; that a minute after these shots Barnes entered the front door of the office; that he met Barnes at the door, coming within two yards of him; that he held up his hand to Barnes and told him to wait a minute, to hold up there; that he told Barnes that he had not done a thing in the world to him and that Barnes said: "Oh, yes you have just like the rest of them," and that Barnes shot him in the stomach; that that was the last bullet in his pistol and he began to reload it; that he broke it and "unbridged" it and he

seemed to have some trouble and he threw his empty shells on the floor; that Barnes told him that he was a man not afraid and a mean son-of-a————, but that he would take him to the hospital; that Barnes then walked down toward the mill; that he walked away and said "There is one more son-of-a———— I want to get and I will be through"; that he saw him shoot a man and heard the man's wife scream "Oh, he has shot Joe Brown"; that she referred to Joe Brown Peacock. There was testimony that Willis Barnes had had a lick on his head five or six years before the killings; that his mind was affected and that he was insane at times. There was also testimony that he was sane. Mrs. Blance Girardo testified that she lived at the cotton mill; had known Barnes about fifteen years; that they had never had any trouble; that after dinner on the day of the shooting Barnes pointed his pistol at her, stared at her and stuck the pistol right in her face; that she worked at the mill but was not an official. The following testimony of D. R. Arrowood, in substance, was offered in evidence in the murder trial by the defendant and was not admitted by the court; that in April, 1945, there existed such differences in regard to hours of work and wages and other conditions; that the differences were submitted to the War Labor Board; that there had been some unrest in the mill for the past several years; that the hours had been satisfactory but the rate of pay was low; that there had been for the last year an effort by the employees to organize an A. F. of L. union; that so far as he knew there had been no efforts on the part of the management of the mill to prevent the organization of a labor union; that the only objection was that the mill's attorney put up a "nice" notice that affected the morale of the people quite a bit; that the notice indicated that if the employees signed up that they might lose their jobs; that the notice said that the decision was up to the employees but that the company preferred that no union be organized. The other testimony of Arrowood which was not admitted is as follows: "Well, all the other mills had been getting raises and we had been reading about it in the paper and the doffers come together and said they were going to demand more money and asked me about it and I said I was not in favor of striking whatever and I said there was a better way than to strike and

we talked along about a week amongst ourselves and then they appointed me on the second shift to represent the second shift to go to Mr. Mayes and I went to him and he did not talk very favorable the first two weeks, and then he said I have already put in for you a raise and on March 23, and he said he had mailed them form ten, it was asking for six cents an hour and that all hushed them up at that time and the boys kept waiting to strike, and one morning I was working out in the garden and I looked up and the whole shift of doffers were there to talk to me, and I told them let's go to town and we will wire the War Labor Board and we asked for fifty-five cents and they wired me and they said we should not be denied fifty-five cents. And then on Thursday I was at the office talking to Mr. Mayes and showed him that telegram, and he said they could not do it, he wouldn't attempt it, and then everybody got together and Willis Barnes was the man wanting me to go to Atlanta and they went around and took up collection and sent me to Atlanta and hired Robert White to carry me and Mr. Whitman up there. When I got to the War Labor Board they said Mr. Mayes was in town but Mr. D. K. Jones advised me to go to another department. I went to five different boards and then returned to Mr. Jones and let him know the results and when I got there he asked if I would meet Mr. Mayes in his office and he arranged that and he advised me to wait there and we agreed there on fifty-five cents. Yes sir, Willis Barnes was acquainted with all these facts. They said they were absolutely mistreating us and if other mills could pay and get the price that the Fitzgerald mill could. Yes sir, I remember when a little deaf and dumb boy had some trouble with Mr. Clark, deceased. I was sitting outside the mill and this Dummy come by—Belk I think his name is, and he walked out behind the mill and said he was sick, I said 'Why don't you go home' and about that time I saw Mr. Clark come from the office and when he met Mr. Clark he took hold of his arm or shirt and they went to the mill and then went on in the mill and out of my sight and the next thing I knew I saw Dummy coming out with his face foremost and said he wanted his hat. I asked Clark what was the matter and he said that little crazy idiot, and then he went to help me find his hat and come and gave it to him, he pitched him out head foremost, there from

the mill. He came out head foremost from the spinning room. He landed on the ground. I could not say that he was shoved or throwed. I saw Mr. Clark's face and hands come out the door too and he hit the ground and got up with his legs skinned. Yes sir, I know about this incident. Yes sir, this defendant knows something about it. All the doffers found out about it and they told me to go to Mr. Mayes and tell him that they did not propose to work under a man like that. I told him what happened and I did not know what happened out of my sight and all I am doing is telling you what the other said. No sir, I couldn't tell whether Dummy was mad or not when he took hold of Mr. Clark's shirt. The only thing I can tell you whether there was any bad feeling between the defendant and Clark or not, this same time the boys all out there, and when I come back from the office and told them that Mr. Mayes told me, that I am not going to let the doffers run the mill and I come back and told them what Mr. Mayes said, he said there will have to be a change made, and this Barnes carried me off and said 'You told me a lie' and said what Mr. Mayes said, and said that he said he was not going to let the doffers run the mill, and he then went back in the mill and the boys asked me what he said, I said go back on the job and then Willis and his wife come out and then Peacock come out there. I couldn't tell you whether after that Willis Barnes and his wife were not permitted to return to work. He said nothing about it, he didn't speak to me. He said you see he is gone and don't you intercede. Clark got beside himself and said 'You see he is gone and he is not coming back.' He used profanity. He said 'You see the G—— d——— son of a ——— is gone and he ain't coming back.' He said 'I mean he is gone and he seems not to like it that I throwed Dummy out. I will throw him out the same way.' He said, 'I don't give a d——— if you don't like it either.' No sir, I never mentioned this situation to the defendant. He never talked about the situation at the mill after that day. Before he had when it seemed to be on his mind." Willis Barnes made the following statements in his own defense on the murder trial, one main statement and two supplemental statements: "Gentlemen, it is true that part of the time I have got nothing but a mind of a small boy. I didn't get no schooling. I was raised

among my brothers and sisters. My mother and father separated. When I was around fourteen years old I come to the Fitzgerald Cotton Mill to work with an uncle out there on a farm, Oscar Seagraves. I worked till about 1936 and then I married and went to work then in the mill about the last of 1936 and from then until the last of 1938 I felt pretty fair. During 1938 we had a union man to come here and during the time this fellow come there and they run him out with clubs and everything and beat him with pipes or anything they could beat him with. And then after that a Preacher Hodge or Dodge man, he came to see what he could do and Mr. Jim come to me himself and tried to get me to help mob him. Gentlemen, that day they took the man out and beat him up and left him for dead and somehow somebody found him and he was saved. Well, after that, the way they fought that union, and they shut the mill down and starved the people to it. They were shut down for a couple of weeks, the people sold their clothes, their furniture and anything they could get to feed themselves with. During that time or shortly after then, I had moved down to Nicholls, Georgia with a fellow Meeks and I farmed down there during the biggest part of the season and I come back to the cotton mill the last part of 1942. During this time they had a habit of working people out there as much as three months without paying them or putting them on the pay roll. I have a sister that worked there two months and one around three months and they didn't get theirs. During that time they passed a law to pay time and a half for overtime. They had been doing it this way half the time when you worked for a man say a half of day they marked it up to you and if this man didn't pay you, you didn't get it. If you made a lot of overtime they marked it up to some of them and you paid. I paid a check on a woman who was to be confined—her name was Irene Melton and I drawed her pay. They had a habit of doing this and depending on you to pay. They had a habit of paying your social security and unemployment. They paid these women that was being out to be confined and some they didn't pay. I have a sister-in-law that talked to the bosses about it and they said it was against the law and it all depended on who you was if you got it or if you didn't. Gentlemen, I am going to tell you, we all

fared tough. The people out there have not had a chance. The last of 1942 and during 1941 or 1942, it was 1941, I will say, Mr. Smith who had worked under Mr. Clark for a year, was killed on the highway in Mr. Clark's jook that is owned by him, and nothing was done about that. The C. I. O. man he was left as dead, that was through Mr. Clark. I moved to Brunswick and I was unable to stay down there, in fact my young ones stayed sick all the time and the clinic down there helped me to get a release so I could get back to Fitzgerald. I moved back to Fitzgerald the last of '43 and the house they gave me to move in, there was no lights, no screens and the yards all growed up as high as my head and just a path around the house to walk around. I went back to work at my spare time and me and my wife cleaned up around the house, wired it, screened it, built door steps and cleaned up the place so we could live there and I did it all out of my own pocket. I fixed up the coal house and the chicken house and then I wasn't able to stay here. I put around $150 to $160 in the fencing and all around there, out of my labor. Well, they had a walkout in 1944 which was up in 1944, it was in 1945 I believe. The way they built up this walkout in 1944, Mr. Clark had Mr. Griner lock up a boy, Pete Luke. This boy was kept in jail a long while and they broke it up. Time and time again the sheriff told me they had no warrant for him whatsoever. That they had been holding him and the boy had not did nothing. The last time I come to see Mr. Griner about it. I met him down at ———— station and a boy was with me, Bobby Seagraves. Mr. Griner told us again that he had no warrant but he had to hold him. I don't know whether he got out that day or the next morning then, but he told us to come back and we come back practically every time he told us, and then he sent for me and I paid the cost of $19.55. I didn't pay all of that myself. The people of the mill gave twelve or either thirteen dollars and I paid the rest to get him out. The boy come on out that evening after he was turned loose and they refused to work him and so he come by my house and told me he had no people around here and that his mother lived at Douglas and told me he had no money and so I had $10 that I gave to him then. Gentlemen, shortly after that I got down with my head and was down two weeks and during

these two weeks they sent me notice to move. When I got able to walk I talked to Mr. Clark and Mr. Mayes. They both allowed they had more hands than they knew what to do with. I knew better. They was sending to the other mills begging help from the other mills to work out there. He persuaded some of them to come out there and about two weeks is as long as he managed to keep them. They wouldn't pay me anything for my work out there and they wouldn't release me whatsoever. All this I put in my house to fix it I would say I got about half of it. My brother-in-law gave me $35 for the fence and post and Bob Seagraves bought the coal house and the chicken house and paid me $15 and Red Pridgen who got the house, paid me $15 for the lights and screen, that's all I got back was labor. I moved out to the railroad shops with a widow woman named Mrs. Stone. I stayed out there four months or my family did. I stayed about two-and-half or three months. I went back and forth to the mill once a week or two or three times a week, trying to get back to work or get a release. The captain finally gave me a release at his son's request. I explained to him to give me one to save me all of that trouble. I left and went to Jacksonville and went to work. I worked down there thirteen weeks and had to move back. I couldn't find a house to live in and a boy by the name of Nelson asked me for the house and I had to give it up. During Christmas I run into Mr. Clark and he begged me to go back to work because they had no hands. I left Jacksonville and come through Brunswick and I talked to the foreman there and he told me not to come back, they were laying off men by the hundreds every day. I come on back to Fitzgerald and made arrangements to go to work and the captain promised me to furnish me a house when he could. I made arrangements with my sister-in-law to stay there until I got a house and we stayed there with my brother until I got a house and me and my wife worked at the mill. A fellow McElmurray moved me from Jacksonville to the house and out and back in a house. I moved in this house possibly three weeks before this walkout in 1945 and during that time Mr. Clark offered me $1500 to kill this Mrs. Smith, the wife of the man that was killed up there on the highway by his place. He said I can get somebody to kill you and her both for that much money. You

know she got shot there in her house. Before this walkout occurred, I was not the cause of it. It was all among the doffers. I did help them. I had some money. I gave them money on going to Atlanta and sending telegrams and for them to go from place to place where they had to go. When they come from Atlanta we went back to work with a promise of six cents raise. We worked four to five weeks after this and they still run over us. Mr. Clark was a man that did not know what a job was. If you done so much this day he would expect that much more tomorrow. During 1944 we doffed two frames of eleven and for the hour, we were paid, some making forty cents and some fifty-five cents and some getting all they made and some would be getting thirteen or fourteen hours a day—all depended on who you were. In fact me and my brother doffed as many as the fellow on the other side—we made $4.18 a day and these other fellows made around $7 to $7.50. That's what we had to put up with. I went to tell you the upkeep of our mill village was terrible. They have been unable to have anything done to these houses in the last five or six years. They did not keep up the houses—you did all that yourself. The reason for their having not kept up their houses, Mr. Clark and the other bosses took all for the benefit of the houses for himself. Mr. Clark has two houses on the highway—he gave his boy one and he gave it back to him because he mistreated him. Since that time Mr. Clark built six houses from that mill and not only that but the home that he kept up. The people didn't get their homes fixed up was because of the bosses. The reason these people not getting any more breaks was the bosses had it in their hands. They wanted everything for self. I don't know how true it is about this talk of selling for the last five years and these bosses are after all they could get so when this happened they were afraid they would lose out. You have no idea how those people were paid, they were not paid wages and hours with the scale. Gentlemen, I don't know nothing about what has happened except what they say is true and I am awfully sorry of what happened. I did get a lick during the first of 1942. I got that lick from a fellow by the name of Doc Smith's place up on the Rochelle road and he can verify that statement. Ever since that time I have spells. This is not the only time I didn't know what

happened. I got down shortly after that in 1942 and after that Dr. Dismuke treated me, and in 1944 at the time I was fired Dr. Daniels treated me. I took what you call turkish baths or something. There is the way they treated this poor deaf and dumb boy. The way they treated him was a shame. Mr. Clark mistreated this boy back in the mill and he throwed him out the door like he had been his dog. He was treated as black as any Negro in this town, and to think a man would do a boy that couldn't speak or hear that was more than I could really stand. Not only that, he has pushed my wife around and cursed her, not only her but several others. That's what we have put up with for the last nine years, that I worked off and on there. I don't know about these things that happened. The last thing I can remember was on Sunday. My brother and sister had a big dinner in town and I was not able to go to it. I was sick and worried and aggravated. I just couldn't stand the fuss and racket and I just asked my wife to go and take the young ones. I didn't want to be bothered with the fuss. I didn't know when they returned from the dinner. I didn't know how long I had been in jail—the next thing that I knew, I was in jail. I had no intentions about what happened—I didn't know nothing about what happened. I believe I can·say that I am hurt worse than any one of them over it. Gentlemen, as I say, I knew nothing about it. I have no intentions and never had any intention of harming anyone and I want to say that whatever happened did not come from my heart. I had no intentions of such a thing. Gentlemen, as I say, I have these spells, not one but several, but this is the only time I know of such as this has happened but I knew nothing about it and still don't know nothing about it. As I say, I had no intentions about it—no intention of harming Mr. Clark nor no other man. I want to say, not only to you, but to the people that that did not come from my heart whatsoever, so gentlemen I want to beg mercy of you and the court, and ask you gentlemen, to spare my life and be as merciful as you can." "I don't know where it is. I don't read and write, but this paper here says I am insane—that's the reason I am not in the army. I don't know what you call it. I went before them and I was turned down. The lawyer there, he has got it with his files, I don't know how to explain it. I

have had it read to me. I was not accepted on account of physical fitness." "Gentlemen, the point I left out. At the time we came from Atlanta I went back to Mr. Clark and talked to him, which I was not the only one and several others went there and during our talk Mr. Clark he got mad with me and threatened me and reminded me of the times he had threatened me and also told me the whole world was not big enough to hold us both, let alone Ben Hill County. He talked on and argued about the way people was doing. In fact he was a man that felt that everyone was wrong but him. The last words I remember having to say to Mr. Clark and the last he said to me. I asked him if I go to work or not, and the last he said to me was to study over what he told me. That's the point which I left out." The Chief of Police of Fitzgerald testified that in his opinion Barnes was not drunk but had been drinking liquor. The Sheriff of Ben Hill County testified that he saw Willis Barnes about forty-five minutes after his arrest; that Barnes said that he had been mistreated and that it might not do him any good but would get somebody else something is why he did it; that Barnes said he had been drinking; that he smelled liquor on Barnes' breath.

1. The first question to be considered is, what is the effect of the agreement to receive in evidence the brief of evidence in the murder trial? As to the sworn testimony, it would seem that the agreement meant that the parties agreed that the testimony would be treated as if it had been given under oath on the trial of the compensation case. We think that it is reasonable to conclude that the agreement also contemplated that the defendant's statement in the murder case was to be treated as if it had been given under oath in the compensation case, otherwise the case would have had to be tried under rules different from those ordinarily followed in the trial of compensation cases. As to the testimony which was excluded by the court in the murder trial with reference to the differences between the employees and management, without making a ruling as to what the agreement meant with reference thereto, we shall treat the testimony as having been admitted and as being entitled to consideration in the trial of the compensation case.

2. The board found that, even if the killing was due to the

differences between the mill and Barnes and the other employees, it did not arise out of the employment. Of course, if the board applied the wrong law to the facts found, this court can review the finding. At the outset, let us make it clear that we make no ruling in this case as to whether or not an injury could be said to arise out of employment by reason of the dissatisfaction on the part of an employee with the way a business is being operated, when there is immediate causal connection of some kind between the dissatisfaction, or dispute, and the injury. We simply hold in this case that under no theory of the evidence would an award of compensation be authorized. It follows that the denial of compensation was proper, whatever may have been the reason assigned, and the court did not err in affirming it.

The burden of proof was upon the claimant to show that the injury arose out of and in the course of employment. The injury arose out of the employment if after the event it "appears to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence." *Globe Indemnity Co.* v. *MacKendree,* 39 *Ga. App.* 58 (146 S. E. 46), s. c. 169 *Ga.* 510 (150 S. E. 849). Under any view of the evidence it failed to measure up to this requirement. If Willis Barnes was insane the injury is not compensable. The evidence does not contain facts showing that the insanity of an employee would follow the course of conduct in the operation of a mill as a rational consequence. The employee did not go crazy at the mill and suddenly injure an official of the employer company. In one view, the evidence may be said to have demanded the finding that Barnes was insane at the time of the killing or so drunk that he could not remember the fact of the killing. He stated, and in effect under oath, that he did not remember the killing. Surely, if he did not remember the fact, he did not remember the reason or cause of his acts. This positive, uncontradicted "testimony" is not inconsistent with any circumstance tending to show otherwise, and prevails over consistent circumstantial evidence. The evidence falls short of the legal requirements if drunkenness was the prevailing cause. The conduct of the mill cannot be said to have been the rational cause of the killing if it took intoxication to set off the explosion. Assuming that there was no drunkenness and no insanity, the circum-

stances tending to show that the cause of the killing was the sick and brooding and poisoned mind of Barnes due to the long-time conduct of the mill and its high officials, there is nothing definite enough in the evidence, as to particular conduct toward Barnes, or as to the time of such conduct, to authorize a finding that the killing was the rational consequence of such conduct. For all we know, enough time had elapsed up to 1945 for all differences prior thereto to subside. If they had, certainly murder cannot be said to be the natural and reasonable consequence of a mere position by an employer taken against unionization. There is no fact which shows that anything was done to Barnes which evoked sudden anger or passion and caused him to act under heat of passion. The conduct of the mill and the act of Barnes are too remote in time to bring them within the rule of rational consequence. It must also be remembered that Barnes was not at work when he went on his rampage. In such case the killing in the course of employment was merely incidental. He might have done his killing anywhere else his victims happened to be. If Barnes killed because of Clark's threat, the injury obviously is not compensable. A large number of cases have been cited by both sides, but none is close enough to be of much value except as to general principles on which all agree. The evidence in the case of Mrs. Peacock, No. 32640, who claimed compensation for the death of her husband, was substantially the same as that in the Clark case, above discussed, except that Barnes did not contend that Peacock threatened him or that he had specifically done anything which was objectionable to Barnes.

The evidence demanded the awards denying compensation in both cases and the court did not err in affirming them.

*Judgments affirmed. Sutton, C. J., and Worrill, J., concur.*